Raynes McCarty  
By:    Harold I. Goodman, Esquire        Attorneys for Plaintiff Thomas L. Mangan  
        Dan Bencivenga, Esquire (DB5590)  
        R. Michael Clark, Esquire (03938-2009)  
116 White Horse Pike  
Haddon Heights, NJ 08035  
Telephone No.: 856 - 546 - 5454

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THOMAS L. MANGAN,<br>                  Plaintiff,<br><br>v.<br><br>CORPORATE SYNERGIES GROUP, INC.<br>     and<br>PANTELIS A. GEORGIADIS,<br>                 Defendants. | Civil Action<br><br>No.:<br><br>JURY TRIAL DEMANDED |

### COMPLAINT

1. Plaintiff Thomas L. Mangan was falsely accused of attempting to misappropriate company funds for his own use. As a result, he was unjustly fired from his job as CEO of defendant Corporate Synergies Group, Inc. ("CSG").

2. Lacking cause for the termination, CSG breached the terms of its Employment Agreement with Mr. Mangan and denied him the severance payments he was due.

3. Moreover, by wrongfully terminating Mr. Mangan's employment, CSG also denied him the bonus he was due under the terms of his Employment

Agreement ("Agreement"). The Agreement required CSG to provide Mr. Mangan with "achievement metrics" that were to be used in calculating the amount of his bonus (which, under his Agreement, was expected to equal the amount of his annual base salary). In breach of the Agreement and its duty of good faith and fair dealing, CSG failed to provide those "metrics" to Mr. Mangan and thereby deprived him of the bonus he earned.

    4. A day after it unjustly fired Mr. Mangan, CSG appointed Pantelis "Pete" Georgiadis as its interim CEO. Shortly after his appointment, Mr. Georgiadis met with CSG's executives and held town hall meetings with all of its employees. During those meetings, Mr. Georgiadis defamed Mr. Mangan by falsely accusing him of being a poor performer and leader and for being responsible for CSG's financial woes. These statements were false, malicious, reckless and/or negligently made and irreparably damaged Mr. Mangan's reputation which, until then, had been unblemished.

## JURISDICTION

    5. The parties' citizenship being diverse and the amount in controversy in excess of $75,000.00, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

## VENUE

6. Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391 (a) and (c) since the defendants both reside here and each of the actions and/or omissions complained of occurred in this District and vicinage.

## PARTIES

7. Plaintiff Thomas L. Mangan currently resides at 4 Drumlin Road, South Glastonbury, Connecticut 06073.

8. Defendant CSG is a Delaware corporation with its principal place of business located at 200 East Park Drive, Suite 600, Mount Laurel, New Jersey 08054.

9. Defendant Pantelis A. Georgiadis is the interim CEO of CSG and, in that capacity, maintains his principal place of business at 200 East Park Drive, Suite 600, Mount Laurel, New Jersey 08054.

## STATEMENT OF FACTS

10. Formed in 2003, CSG is a privately held employee benefits consulting firm and broker that provides a full range of services to medium-sized businesses throughout the United States.

11. Prior to hiring Mr. Mangan as its CEO, CSG was faced with significant financial and regulatory problems, a weak infrastructure and a leadership void that left it struggling for direction and stability.

12. Mr. Mangan was hired in September 2009 to revive CSG and help make it a profitable and successful enterprise for its owner, employees and clients.

13. At the time of his hire by CSG, Mr. Mangan was an 18 year veteran of the employee benefits industry. He was a proven leader and visionary having served as the President of the Employee Benefits Division of HUB International before joining CSG. As CSG stated in the press release it issued announcing his appointment: "Mangan is a recognized leader in the industry being voted as one of the top 10 most influential people in the industry by the Employee Benefit News." See Exhibit A attached hereto and incorporated by reference.

14. During the course of his employment as CEO of CSG, Mr. Mangan was responsible for turning the company around and making it a successful business venture.

15. As examples, CSG achieved every monthly goal that was set for it during Mr. Mangan's tenure and, for the first time ever, began to earn a profit.

16. In addition to achieving CSG's financial goals, as CEO Mr. Mangan was responsible for stabilizing CSG, for expanding its business and providing it with the leadership and infrastructure it had previously lacked.

17. Mr. Mangan's success did not go unnoticed. In an e-mail dated June 29, 2010, Dawn Arnall, the owner of CSG, wrote Mr. Mangan and said: "... we are delighted that you are taking the leadership to drive the profitability improvements so desperately needed by the business ... [Y]ou have my full support toward driving this company to top quartile profitability and growth performance in the next 3 years."

18. Less than two days later CSG wrongfully terminated Mr. Mangan's employment.

## COUNT I: BREACH OF CONTRACT

## PLAINTIFF V. DEFENDANT CSG

19. Plaintiff incorporates by reference paragraphs 1 through 18 of his Complaint as if they were set forth in full.

20. On or about September 2, 2009 the parties executed an Employment Agreement ("Agreement") under which CSG agreed to employ Mr. Mangan as its CEO on terms and conditions set forth thereunder. A true and correct copy of that Agreement is attached hereto as Exhibit B and incorporated by reference.

21. Under Section 1.2.3. of the Agreement, if CSG terminated Mr. Mangan's employment "without cause," CSG was liable to him in an amount of severance pay "equal to the amount of base salary that Mangan would have received in

the period between the date of termination and the expiration of the Term [of the Agreement]."

22. The term of the Employment Agreement, as set out in Section 1.2.1, ran from September 2, 2009 until December 31, 2010.

23. CSG terminated Mr. Mangan's employment on July 1, 2010, effective immediately.

24. Mr. Mangan was informed of his termination by Lewis Greenblatt, the Chairman of CSG's Board of Directors, and by Eileen Fogarty, CSG's Human Resources Director.

25. Neither Mr. Greenblatt nor Ms. Fogarty provided Mr. Mangan with anything in writing setting forth the reason for his sudden dismissal.

26. Mr. Mangan asked both Mr. Greenblatt and Ms. Fogarty why he was being fired.

27. Mr. Greenblatt responded by accusing Mr. Mangan of financial improprieties in connection with the sale of his home in Southport, Connecticut.

28. There was no basis whatsoever for that accusation.

29. Pursuant to Section 2.4 (ii. - v.) of Mr. Mangan's Employment Agreement, CSG agreed to pay him for designated relocation expenses in connection with the sale of his home in Connecticut.

30. On or about June 21, 2010, Mr. Mangan asked, first, Ms. Fogarty and then Mr. Greenblatt for permission to have CSG pay the five percent (5%) realtor's fee on the sale of his Connecticut home rather than the three percent (3%) set out in his Employment Agreement.

31. Ms. Fogarty told Mr. Mangan she would support his request but that he needed to obtain Mr. Greenblatt's approval for it.

32. Mr. Greenblatt responded favorably to Mr. Mangan's request for three stated reasons: first, because Mr. Mangan's move to New Jersey was necessitated by CSG as stated in Section 2.2.4 of his Agreement; second, because he was incurring a substantial loss on the sale of his Connecticut home; and third, because of the outstanding job being done by Mr. Mangan. For those reasons, Mr. Greenblatt told Mr. Mangan on June 21, 2010 that he would take care of ensuring that the realtor's fee of 5% was paid.

33. Mr. Mangan subsequently e-mailed and telephoned Mr. Greenblatt to inquire whether he had taken care of the issue.

34. Mr. Greenblatt did not respond to either his e-mails or telephone calls.

35. The sale of Mr. Mangan's Connecticut home was scheduled to close on June 30, 2010.

36. Mr. and Mrs. Mangan had signed all the settlement papers the previous weekend.

37. On June 29, 2010 Mr. Mangan was at work at CSG's office in Mount Laurel, New Jersey.

38. Mrs. Mangan and their daughter were at the family's Connecticut home attending to the move with their moving company.

39. That morning Mrs. Mangan called her husband and told him they needed to wire transfer $126,759.77 to their attorney's escrow account to cover their share of the closing costs (as noted, they sold their Connecticut home at a loss in order to move to New Jersey to a rental property close to CSG's Mount Laurel office).

40. Mrs. Mangan could not leave home to get to the bank because she was with the movers getting ready to leave for New Jersey.

41. Mr. Mangan also was unable to get to their bank since the closest branch was over an hour away. For that reason, he asked CSG's Controller if there were sufficient company funds on hand to advance him the closing costs which he would repay later in the day.

42. CSG's Controller, Doug Ziggari, informed Mr. Mangan that CSG did have sufficient funds available but told him to ask the acting CFO, Tim Lemmon, for approval of the transaction.

43. Mr. Mangan asked Mr. Lemmon for approval for the advance which he would repay later that day.

44. Mr. Lemmon replied that he was not comfortable doing so.

45. Mr. Mangan accepted Mr. Lemmon's reply and then contacted his wife to make other arrangements to pay their closing costs.

46. Mrs. Mangan then had no choice but to leave the movers at their home in Connecticut and go to their bank and have the necessary funds wire transferred to their attorney's escrow account.

47. Mr. Mangan violated no rule, policy or practice of CSG in requesting a same day in and out advance of his closing costs.

48. For some time CSG has had a practice of advancing funds for its employees without any adverse consequences being imposed on them.

49. In fact, over the years CSG has used company funds to pay for numerous personal expenses of its executives and consultants, including payments made to former CEO Eric Raymond for costs related to his personal automobile and for all his IT needs at home; payments for an outside consultant, Synetro Capital, even though formal Board approval had not been obtained for the consultancy; and payments for the medical expenses of non-employee consultants Scott Birnbaum, Tim Lemmon and Jim Holman.

50. CSG had no cause upon which to terminate Mr. Mangan's employment.

51. As a direct and proximate cause of his wrongful termination, Mr. Mangan was denied the severance pay he was due under his Employment Agreement. He also incurred substantial incidental expenses associated with the rental of a property in New Jersey that he could not use and relocation costs he incurred to move his family back to Connecticut in order to begin a new job there.

## COUNT II: BREACH OF CONTRACT AND BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

### PLAINTIFF V. DEFENDANT CSG

52. Plaintiff incorporates by reference paragraphs 1 through 51 of his Complaint as if they were set forth in full.

53. Pursuant to section 2.3 of Mr. Mangan's Employment Agreement, CSG was required to develop "achievement metrics" for Mr. Mangan in order to calculate the amount of his bonus for 2010.

54. To do so, CSG was required to consult with Mr. Mangan about those metrics and to have them in place "[p]rior to December 31, 2009."

55. If those metrics were fully achieved, it was anticipated Mr. Mangan would "earn a bonus in calendar year 2010 of $350,000" (equal to his annual base salary).

56. Despite Mr. Mangan's multiple requests to Mr. Greenblatt, the person responsible for developing those achievement metrics, none was ever provided to him.

57. CSG's failure to provide Mr. Mangan with those achievement metrics constituted a breach of Mr. Mangan's Employment Agreement.

58. Moreover, by not developing those achievement metrics and by wrongfully terminating Mr. Mangan's employment, CSG denied Mr. Mangan the bonus he was due for 2010.

59. By denying Mr. Mangan his bonus for 2010, CSG breached the duty of good faith and fair dealing that it owed Mr. Mangan.

### COUNT III: POST-TERMINATION DEFAMATION CLAIM

### PLAINTIFF V. DEFENDANT CSG

60. Plaintiff incorporates by reference paragraphs 1 through 59 of his Complaint as if they were set forth in full.

11

61. On July 2, 2010, a day after Mr. Mangan was fired, CSG appointed defendant Georgiadis as its interim CEO.

62. Previous to that appointment Mr. Georgiadis had been acting as an outside consultant to CSG, albeit without formal approval of its Board of Directors.

63. On or about July 2, 2010 defendant Georgiadis met with members of CSG's operating committee, a group that included Andrew Bloom, Robert Prucnal, Chris Fallon, Michael Lisa, Eileen Fogarty, Tim Lemmon, Christa Rapoport and Randy Shaw.

64. In that meeting defendant Georgiadis accused Mr. Mangan of financial improprieties and further stated that CSG had lost faith in plaintiff's leadership ability and his management skills.

65. There was no basis in fact for these statements.

66. On or about July 16, 2010 defendant Georgiadis conducted several town hall meetings via videoconference with all of CSG's employees. These videoconferenced meetings were attended by more than 200 of CSG employees.

67. During these town hall meetings defendant Georgiadis stated that Mr. Mangan had left CSG because he was not performing his job or providing CSG with the leadership it expected. He further accused plaintiff Mangan of misleading CSG employees into believing that CSG was making a profit. In short, he implied that Mr. Mangan was "cooking the books."

12

68. There was no basis in fact for any of these accusations or inferences. Indeed, CSG's owner, Dawn Arnall, had just praised plaintiff's performance and leadership skills and for driving CSG to profitability. See ¶ 17 *infra*.

69. The statements made by defendant Georgiadis concerning plaintiff were malicious, reckless and/or negligently made and had the purpose and effect of damaging and injuring plaintiff's good name and reputation in the eyes of CSG's executives and employees.

70. The statements made by defendant Georgiadis concerning plaintiff Mangan were defamatory and slanderous *per se*.

71. The statements made by defendant Georgiadis concerning plaintiff Mangan were not justified nor were they privileged communications.

72. Prior to these communications by defendant Georgiadis, plaintiff Mangan had maintained and enjoyed a distinguished and unblemished reputation for honesty and integrity within the employee benefits community. Indeed, as CSG's own press release stated at the time of his hire, Mr. Mangan was "a recognized leader in the industry." See Exhibit A hereto.

73. Plaintiff Mangan's reputation for honesty and integrity were irreparably harmed by the defamatory statements attributed to him by defendant Georgiadis.

74. Plaintiff Mangan is entitled to recover compensatory and punitive damages from defendant Georgiadis because of the malicious and reckless statements he made about the plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Mangan respectfully respects the Court to enter judgment in his favor and against defendants CSG and Georgiadis and to include in its judgment the following damages:

    a. An award representing the severance payments plaintiff Mangan is due from CSG with prejudgment interest;

    b. An award representing all the consequential damages suffered by plaintiff Mangan as a result of his wrongful discharge;

    c. An award representing the bonus plaintiff Mangan is due for his services to CSG in 2010, including services he would have rendered but for his wrongful employment termination;

    d. An award of compensatory damages against defendant Georgiadis for having defamed plaintiff Mangan;

    e. An award of punitive damages against defendant Georgiadis for the malicious, reckless and unjustified defamatory

      statements he communicated to CSG's executives and employees about plaintiff Mangan;

f.   An award of reasonable counsel fees and costs to be assessed against defendants CSG and Georgiadis; and

g.   Such other legal and equitable relief as may be just and proper under the circumstances.

RAYNES McCARTY

By: _____

Harold I. Goodman
Dan Bencivenga, Esquire (DB5590)
R. Michael Clark, Esquire (03938-2009
116 White Horse Pike
Haddon Heights, NJ 08035
Telephone No.: 856 - 546 - 5454

Counsel for Plaintiff Thomas L. Mangan

Dated: 11/9/10